

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

1. **DR. ROBERT ZOELLNER**
2. **CLAY CLARK**
3. **JAMES J. DeCRISTOFARO, Esq.**
4. **AARON A. ANTIS**
5. **DEBBIE L. ANTIS**
6. **STEPHEN N. CURRINGTON**
7. **JASON DANE MALIK BEASLEY,**

        Plaintiffs,

    -against-

1. MAYOR GEORGE THERON BYNUM IV
2. **BRUCE DART**
3. VANESSA HALL-HARPER
4. **JEANNIE CUE**
5. **CRISTA PATRICK**
6. **KARA JOY MCKEE**
7. **LORI DECTER WRIGHT**
8. **PHIL LAKIN, JR.**
9. **BEN KIMBRO**
10. **THE CITY OF TULSA**
11. **THE TULSA DEPARTMENT OF HEALTH,**

        Defendants.

Case Number: 20-CV-410-TCK-FHM

# FILED

SEP **1 4** 2020

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

### FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF & DAMAGES

This First Amended Complaint is being submitted as a matter of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

Plaintiffs Dr. Robert Zoellner, Clay Clark, attorney James J. DeCristofaro, Esq. (an attorney admitted to practice in New York, but not yet admitted in Oklahoma), Aaron A. Antis, Debbie L. Antis, Stephen N. Currington, and Jason Dane Malik Beasley (collectively, the "Plaintiffs"), proceeding *pro se*, as and for their First Amended Complaint against Defendants, in

their personal and individual capacities, George Theron Bynum IV, Bruce Dart, Vanessa Hall-Harper, Jeannie Cue, Crista Patrick, Kara Joy McKee, Lori Decter Wright, Phil Lakin Jr., and Ben Kimbro (collectively, the "Individual Defendants"), and the City of Tulsa and the Tulsa Health Department (collectively, the "City Defendants," and collectively with the Individual Defendants, the "Defendants"), hereby allege as follows:

## PRELIMINARY STATEMENT & BACKGROUND

1.     The Court should invalidate and repeal Ordinance No. 24408 of the City of Tulsa (attached to this First Amended Complaint as Ex. A, the "Tulsa Mask Mandate") because face coverings create an "oxygen deficient atmosphere," which the United States Department of Labor, Occupational Safety and Health Administration ("OSHA") defines as an "atmosphere with an oxygen content below 19.5% by volume." 29 CFR 1910.134(b).  Forcing people to work, live, shop, eat, and visit in an environment where the oxygen level falls below 19.5% has been proven to cause irreparable physiological damage to the body of humans and begins depriving them of much needed oxygen to a dangerous level within just fifteen (15) seconds (or much less) of putting on a face covering.  Doctors, scientists, and other medical professionals will line up in this Court to demonstrate and testify that face coverings lower oxygen levels in the immediate atmosphere of someone wearing face coverings to less than the Department of Labor's required 19.5%, normally within less than fifteen (15) seconds.  Depriving people of oxygen has been proven to create physiological damage, which is indisputably an unacceptable health hazard.

2.     The Plaintiffs either own or visit businesses in Tulsa; the Tulsa Mask Mandate, with a few arbitrary and capricious exceptions, requires _everyone_ to wear masks while present in Tulsa retail and other locations.  Plaintiffs and, where applicable, their employees experience significant symptoms and side effects from wearing a face covering, including migraine

headaches, shortness of breath, and dizziness; also while wearing a face covering, they feel light headed, claustrophobic, nervous, anxious, and stressed. Put simply and colloquially, while wearing a face covering, Plaintiffs and their employees (as applicable) cannot breathe, and find themselves gasping for air. They do not normally have these symptoms or side effects when not wearing a face covering.

3.      And these symptoms and side effects Plaintiffs experience from wearing a face covering are not limited to any particular style of face covering or any particular face covering manufacturer. These symptoms and side-effects occur repeatedly, consistently, predictably – and cause harm – across the board. Indeed, all of these face coverings have one thing in common: they all cause Plaintiffs to experience the same health threatening symptoms.

4.      Making matters worse, while being required to wear a face covering at their business locations in Tulsa, because face coverings reduce the oxygen available to Dr. Zoellner and Mr. Clark and the other Plaintiffs (as applicable) while they and their employees are wearing one, the symptoms and side effects they experience, particularly light headedness and dizziness, cause them and their employees to be at risk of additional hazards, including but not limiting to passing out. This makes it unreasonably difficult to live, to be free and work, and to pursue happiness, all of which are addressed – indeed, declared and mandated unequivocally as "unalienable rights" – in the Declaration of Independence:

> We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.--That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, --That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.

5.      Importantly, Google defines "unalienable" as "another term for inalienable,"[1] and defines "inalienable" as "*unable to be taken away from or given away by the possessor*."[2] Accordingly, the Tulsa Mask Mandate is at direct odds with, and in stark contravention of, the Declaration of Independence.  This is not a mere inconsistency; the Tulsa Mask Mandate is a violation of foundational inalienable rights, period.

6.      This is an extremely serious issue:  the Tulsa Mask Mandate is compromising the health of the Plaintiffs, and the health of every single employee, citizen, and guest of Tulsa when wearing a face covering.  According to the United States Department of Labor, OSHA:

> Human beings must breathe oxygen to survive, and begin to suffer adverse health effects when the oxygen level of their breathing air drops below 19.5 percent oxygen.  Below 19.5 percent oxygen, air is considered oxygen-deficient.  At concentrations of 16 to 19.5 percent, workers engaged in any form of exertion can rapidly become symptomatic as their tissues fail to obtain the oxygen necessary to function properly.  Increased breathing rates, accelerated heartbeat, and impaired thinking or coordination occur more quickly in an oxygen-deficient environment.  Even a momentary loss of coordination may be devastating to a worker if it occurs while the worker is performing a potentially dangerous activity, such as climbing a ladder.

Fairfax, Richard E, OSHA Director, April 2, 2007 Osha Interpretation Letter. (https://www.osha.gov/laws-regs/standardinterpretations/2007-04-02-0) (internal citations, brackets, and ellipses omitted).  In addition, the "rulemaking record for the Respiratory Protection Standard clearly justifies adopting the requirement that air breathed by employees must have an oxygen content of at least 19.5 percent.  A lesser concentration of oxygen in employees' breathing air could endanger them physiologically and diminish their ability to cope with other hazards that may be present in the workplace."  Id.  Perhaps most important, and equally alarming: "Breathing

---

[1]   https://www.google.com/search?q=define+unalienable&rlz=1C5CHFA_enUS886US886&oq=define+unalienable&aqs=chrome..69i57j69i59l2j69i60l5.3554j0j4&sourceid=chrome&ie=UTF-8.

[2]   https://www.google.com/search?rlz=1C5CHFA_enUS886US886&q=define+inalienable&spell=1&sa=X&ved=2ahUKEwjI_vH-kuTrAhUBXa0KHXH6BZcQBSgAegQIDhAn&biw=1440&bih=665.  (Emphasis added).

air containing less than 6 percent oxygen produces convulsions, then apnea (cessation of breathing), followed by cardiac standstill. These symptoms occur immediately. *Even if a worker survives the hypoxic insult, organs may show evidence of hypoxic damage, which may be irreversible.*" Id. (Emphasis added.)

7.      In addition to studying the OSHA regulations on acceptable and impermissible oxygen levels, Plaintiffs have consulted with a litany of doctors, scientists, and other medical professionals, all experts in their respective fields, who are prepared to present testimonial and demonstrative evidence to the Court on the issue of the harm that requiring face coverings – via the Tulsa Mask Mandate – is causing to Tulsa's citizens and visitors. These experts include, but are not limited to, one or more of Plaintiff Dr. Zoellner, Dr. James Meehan, Dr. Judy Mikovitz, Dr. Bryan Ardis, Dr. Chad Edwards, and bestselling nutrition and health expert, KC Craichy, among others.

8.      Presumably realizing the harmful effects of – or, more appropriately, the abject irrelevance of – face coverings relative to COVID-19, the Oklahoma State Board of Cosmetology and Barbering and the Advisory Board on Massage Therapy do not require masks for "cosmetology and barbering related establishments and schools," stating: "Masks-Establishment employees/workers/booth renters etc.:  In the Governor's PHASE 3 plan, *Mask (sic) are not required*, however; protecting your health and safety as well as the clients, should be priority." Oklahoma State Board of Cosmetology and Barbering and the Advisory Board on Massage Therapy, Safety Guidelines for reopening Barber and Cosmetology Salons, REVISED FOR PHASE 3, dated June 1, 2020, attached to this First Amended Complaint as Ex. B (emphasis added).  Yet, for some undisclosed reason, and it cannot possibly be a good one, the City of Tulsa

requires its citizens and visitors to wear what are now clear to be dangerous and hazardous face coverings, as far as health is concerned.  Put another way, face coverings are dangerous.

9.     These United States, including the states themselves and their municipalities, are governed by the Constitution of the United States of America, which is not an optional, fair-weather document that applies in some instances but not in other instances.  It applies all the time, in all instances, and in its barest and most rudimentary form, it guarantees freedom.  It gives its citizens inalienable rights.  With that said, it is not unbounded, and the wisdom of the drafters of the Constitution realized and understood that to function properly, government – and the rights of the people – have to have boundaries.  For instance, while the Constitution guarantees freedom, there are limits.  It is undisputed and universally accepted that the Constitution does not give us the right to commit murder, or the right to commit other crimes, and imposing these limitations is largely left to the states (*or to the people*), in the Tenth Amendment of the Constitution, which provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people*." (Emphasis added.)  This is what's known as the police power, which gives the power to the states (*or to the people*) to regulate for the health, safety, and welfare of its citizens.

10.     However, the power accorded to the states is not absolute, and there are limits.  For instance, where, as here, the Defendants are attempting to regulate the fundamental rights of protection of citizens against unreasonable seizures of their person (the Fourth Amendment), due process (the Fifth Amendment and the Fourteenth Amendment), the rights reserved to the people (the Ninth and Tenth Amendments), and the right to refuse unwanted medical treatment, the Tulsa Mask Mandate has to be "narrowly tailored to achieve a compelling government interest" to withstand constitutional muster under the "strict scrutiny" test on constitutionality.  And indeed,

6

the right to refuse unwanted medical treatment, such as wearing a face covering, is a fundamental

right reserved to the people by the Constitution: "Everyone, regardless of physical condition, is

entitled, if competent, to refuse unwanted life saving medical treatment . . . ." <u>Vacco v. Quill</u>, 521

U.S. 793, 800 (1997).  According to the National Institute of Health's website:

> Public health programs that are based on force are a relic of the 19th century; 21st-century public health depends on good science, good communication, and trust in public health officials to tell the truth.  In each of these spheres, constitutional rights are the ally rather than the enemy of public health.  Preserving the public's health in the 21st century requires preserving respect for personal liberty.

Wendy K. Mariner, George J. Annas, and Leonard H. Glantz, *Jacobson v. Massachusetts: It's Not Your Great-Great-Grandfather's Public Health Law* (April 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1449224/.

      11.    The warning and limitations label on the packing for the masks themselves

demonstrates how severe the health issues are associated with wearing masks.  To wit, one

"approved" mask purchased at a Tulsa CVS had the following warning and limitations label on its

packaging:



Two warning and limitations – numbers 2 and 3 – are of particular note, respectively:  "Before

using this mask, consult an Industrial Hygienist or Occupational Safety Professional to determine

the suitability for your intended use."  It does not say consult a doctor or virologist.  It goes on to

say: "*Use only in adequately ventilated areas containing sufficient oxygen to support life.  Do not*

*use this mask when oxygen concentration is less than 19.5%*." (Emphasis added.)  Plaintiffs tested the oxygen levels inside the mask while wearing them and within seconds, the oxygen level dropped below 19.5%; therefore, by the mask manufacturer's own warning, the mask should not be warn under those circumstances.

12.    In light of the foregoing, what is the science behind wearing face coverings in Tulsa?  Did the Defendants consider the harm that face coverings cause, such as decreased oxygen level intake?  Did the Defendants consider the increased harm to the public at large stemming from not only allowing, but requiring, face coverings, when face coverings have been proven increase the level of sickness in the community due to prolonged daily oxygen deprivation?  Did the Defendants consider the likelihood of crimes perpetrated by masked criminals or criminals otherwise wearing face coverings, like bank robberies?  See cf. Claudia Harmata, *Florida Sheriff Bans Deputies, Visitors from Wearing Masks amid State's Record COVID-19 Deaths*, People (August 12, 2020), https://people.com/health/florida-sheriff-bans-deputies-from-wearing-face-masks-as-state-set-new-daily-record-for-covid-19-cases/?utm_medium=browser&utm_ source= people.com&utm_content=20200812&utm_campaign=634093&fbclid=IwAR2EuSgjd0I5K76se 7s8PVM8cmM0Vw6g4UzYyw0r2_PcHV8RUPWJjPtZ-_4.   Did the Defendants consider that according to several sources, including Doctor and Senator Rand Paul, when referring to the COVID-19:

> The vast majority of people to get this are asymptomatic, or mildly symptomatic . . . .  If you look at under age 18, the mortality rate's about one in a million, if you look at age 18-45, the mortality rate's about 10 in 100,000.  Above that it increases, but interestingly, it is still pretty small, and the vast majority – even people up to 65 years of age, it may well be between 95 and 99 percent have a very mild case of this.  So I'm not saying it's a benign disease, people do get sick and die from this.  But your chances are good.  We shouldn't live in fear forever.  We should take normal precautions, we should assess the risks.  People who are older should take more precautions, but we shouldn't, you know, cover the faces of

8

our children and say you're gonna have to live your whole life with your mask on.
We shouldn't do that, and *the government definitely shouldn't mandate it*.

Rand Paul, https://www.bitchute.com/video/YvzF5iJMlXwW/ (last checked August 13, 2020)
(emphasis added).

13.     The public record for the hearing on the Tulsa Mask Mandate is available in video
form online at https://cityoftulsa.viebit.com/player.php?hash=oNQMWIFTrsSI#.     Plaintiffs
challenge Defendants to point to any evidence introduced at the hearing that Defendants believe
to be objective, offering views on all sides of the face coverings issue.  This would include
discussing and reviewing, for example, evidence that speaks to the effectiveness of face coverings
in stopping the spread of the COVID-19, the ineffectiveness of face coverings stopping the spread
of COVID-19, the potential of face coverings actually *increasing* the spread of COVID-19, the
harm caused to the human body by wearing face coverings, the survival rate of persons infected
with COVID-19, and the ways that COVID-19 spreads, or any other relevant, objective, and
competing evidence.  Did Defendants develop a plan on how to educate the public on how to wear
a face covering, since Defendants found it necessary to mandate the wearing of face coverings?
Was Tulsa City Council Chairman Ben Kimbro actually wearing the mask properly to stop the
spread of COVID-19 while conducting the July 15, 2020 hearing on the Tulsa Mask Mandate in
the image below?



Or Doctor Fauci at a baseball game?



Or Doctor Birx while speaking at a White House Press Conference?



If masks are so critical to stop the spread of COVID-19, then why is it acceptable for Doctors Fauci

and Birx to remove them while everyone else has to wear them?  It is because COVID-19 is not

as dangerous or transmissible as once thought, and because face coverings are pointless in this

context.  Any response other than that simply has zero credibility.  Indeed, on or about March 8,

2020, during an interview on 60 minutes, Dr. Fauci unequivocally stated, without qualification:

> When you're in the middle of an outbreak, wearing a mask might make people feel
> a little bit better, and it might even block a droplet, but it is not providing the perfect
> protection that people think that it is.    And often, there are unintended
> consequences.  People keep fiddling with the mask and they keep touching their
> face.

(https://www.youtube.com/watch?v=PRa6t_e7dgI; last visited August 16, 2020.).  In light of the

foregoing, and in light of the fact that face coverings harm people who wear them, there is no

scientific or medical justification to mandate wearing face coverings.

14.     Now, in spite of the overwhelming evidence that face coverings harm the people

who wear them by depriving those people of the oxygen levels they need to live – which is

presumably why Chairman Ben Kimbro is wearing it in such a way so that he can breathe – even

if the Court finds to the contrary, the Tulsa Mask Mandate remains, and always will be,

unconstitutional under these circumstances.  This is because, as the evidence will show, the

recovery and survival rate of those infected with COVID-19 ranges from 95% to over 99%.  How

can any regulation purporting to justify something as draconian, far reaching, invasive, and detrimental to health as the Tulsa Mask Mandate be in place?  How can the Tulsa Mask Mandate, where the disease it is seeking to prevent or slow or retard the spread of (and the effectiveness of face coverings on transmission is in and of itself the subject of intense scientific and medical debate), be relevant or persuasive when the survival rate is as high as over 99%?  Nearly everyone who contracts the disease survives, and wearing the mask causes the healthy to become sick.

15.     Even more, Plaintiffs will offer testimony that there are now treatments that are effective, so effective in fact that the patients put on those treatments recover at nearly 100%, which is not surprising because the survival rate generally is nearly 100% anyway.  Those treatments include the use of *FDA approved* budesonide (administered with a nebulizer), and *FDA approved* hydroxychloroquine with zinc, among others.  In light of this, there is zero scientific or medical justification for requiring anyone to wear a face covering, and thus, the Tulsa Mask Mandate cannot possibly be justified as a valid exercise of police power under the Tenth Amendment.  Therefore, the Tulsa Mask Mandate is unconstitutional, and should be invalidated and repealed, full stop.

16.     Despite the mainstream media's fear mongering narrative, there is no constitutional, medical, or scientific justification for the Tulsa Mask Mandate.  The fact that what has been referred to as a "war" began with this virus in March 2020; objectively, when one considers the facts we have today, the Tulsa Mask Mandate cannot be justified and continues to be unconstitutional.

17.     And the National Institute of Health recognizes the wisdom of the Constitution, and the resulting regulatory process, in this respect:

> History teaches that, in time of war, we have often sacrificed fundamental freedoms unnecessarily.  The Executive and Legislative Branches, reflecting public opinion

> formed in the heat of the moment, frequently have overestimated the need to restrict civil liberties and failed to consider alternative ways to protect the national security.

Wendy K. Mariner, George J. Annas, and Leonard H. Glantz, *Jacobson v. Massachusetts: It's Not Your Great-Great-Grandfather's Public Health Law* (April 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1449224/ (citing Brief Amicus Curiae Fred Korematsu in Support of Petitioners, in Odah v United States, No. 03-334, Rasul v Bush, No. 03-343, and Hamdi v Rumsfeld, No. 03-6696, in the Supreme Court of the United States, at 3–4).

18.   The Plaintiffs and the citizens of Tulsa at large have suffered the loss of fundamental freedoms, the loss of jobs, and now a lack of oxygen from the "heat of the moment" decisions by the Tulsa leadership. The "heat of the moment" way of making decisions has to be over; the science now shows that COVID-19, at least as it relates to children, is less deadly than the flu: "We know that the risk of the disease is extremely low for children, even less than that of seasonal flu. We know that the harms of locking out the children from school are enormous, and we also know, as we all would agree, that educating America's children is right at the top of the list for our nation's priorities." Dr. Scott Atlas making remarks at the White House on COVID-19 and reopening schools. (https://twitter.com/SWAtlasHoover/status/1293998323196506112?s=20; last viewed August 16, 2020.)

19.   Notwithstanding the updated science and that COVID-19 is less dangerous than the seasonal flu, at least for children, unconstitutional decisions are still being made – or persist – without appropriate scientific and medical justification, or that even make sense, thus eroding trust in the Defendants so much so that Plaintiffs had no other choice but to file this lawsuit. To that end, Plaintiffs assert the claims and causes of action below against the Defendants, each forming the legal and factual basis and other support for the Court to invalidate and repeal the Tulsa Mask Mandate immediately. Therefore, the Court should unapologetically do so.

20.     And in so doing, the Court would not be alone, and indeed, there is substantial support locally (and beyond) for repealing the Tulsa Mask Mandate, support from Oklahoma businesses and individuals alike.  These businesses and individuals include, but are not limited to (used with permission):  John Scott McElroy, Amanda Jean McElroy, Royal Valet Tulsa LLC, S&K Group LLC dba Autoflections, Elephant in the Room Men's Grooming Lounge, the Thrivetime Show, Make Your Life Epic, Z66AA.COM, DRZOELLNER.COM, AtoZMEDICAL.COM, Z's Leaf, Regent Bank. ZZZ's Sleep Center, Amber Allen, Devra Anderson Sharp, E'Lena Ashley, Joan Auxer, Nedra Babcock, Jordan Bailey, Cherie Becraft, John Belie, Angie Bowker-Brant, Wynetta Bundy, Laura Burkhart, Bambi Cherry, Tony Cieslak, Mike Cole, Cole's Rental, Mark Byers, Art Curtis, Randy Curtis, Lori Vaughan Curtis, Cathy Duke, Alicia Fisher, Daniel Fisher, Kauleen Fisher, Shaun Fisher, Daniel Housley, Land Run Brands, Jessica Folsom, Kenneth Forgey, Erik Freie, Christy Freie, Norbert Gallagher, Shannon Gallagher, Roberto Garcia, Brittany Garcia, Leslie Hildabrand, Ambience Salon, Josh Gerig, Cathy Hampton, Daisy Haro, Russ Harrison, Rebecca Harrison, Kevin Hayes, Andrea Hayes, Herb Heiny, Kristy Heiney, John Henley, Kristy Henly, Mathew John Roy Henke, Legacy Custom Fence, Romie Henry, Samuel Hess, Jeff Howard, Cheryl Johnson, Klage Kaebel, Brooke Kaebel, John Kelly, John Knippers, Carolyn Knippers, Tricia LaCount, Leigh Lamkin, Kyle Lane, Crystal Lawmaster, Kenneth Lufkin, Jr., Aaron Archambo, Archambo Financial Advisors, Mike Newcomb, Eggberts Restaurant, Paul Hood, Hood & Associates CPAs PC, Gregor Mapherson, Casey Macpherson, Lottie Magdaleno, Alan McBroom, Jessica McCargar, TJ McCormack, James Meehan, Cathy Meehan, Robert Mitchell, Mark Montgomery, Katy Morrison, Michael Morrison, Gary Murphy, Rich Niles, Nicole Nixon, Tyler Nixon, Avery Phibbs, Alex Phibbs, Dana Phillips, Marie Pidgeon, Lisa Primeaux Lotz, Dustin Reif, Danielle Reif, Debbie Robertson, Brianne Ross, Nikki

Rottmayer, Gerald Schelling, Gina Schelling, Eric Schlutter, Kristi Schlutter, Melissa Schupp, Reshawnda Sexton, Marie Sexton, Lindsey Shelton, Reverend Bill Shepard, Anna Taber, Holly Tamer, Donna Tauchor, Casey Teague, Holli Thomason-Blackwell, Carolyn Tolliver, Jill VanTrease, Terri Vivion, Larry Ward, Mikah Washington, Mike Webster, A Plus Firearms, GEI Utility Contracting, Levi Gable, Dan Knapp, Affordable Insulation, Master Machine, Nace Roberts, and Georgdan Roberts, Wayne Thrash, and Thrash Mechanical.

## THE PARTIES

21.     Plaintiff Dr. Robert Zoellner owns and operates several businesses in Tulsa, including, but not limited to, Z66AA.COM, DRZOELLNER.COM, AtoZMEDICAL.COM, Z's Leaf, Regent Bank, and ZZZ's Sleep Center.

22.     Plaintiff Clay Clark owns and operates at least two retail businesses in Tulsa, under the name "Elephant in the Room," one with an address at 1730 S. Boston Ave, Tulsa, Ok 74119, and another at 8931 S. Yale Ave N, Tulsa, OK 74137.

23.     Plaintiffs James J. DeCristofaro, Esq., Aaron A. Antis, Debbie L. Antis, Stephen N. Currington, and Jason Dane Malik Beasley have residences in Oklahoma and frequently visit Tulsa businesses.

24.     Defendant George Theron Bynum IV is the Mayor of Tulsa, and upon information and belief, has an office at 175 E 2nd St, Tulsa, OK 74103.

25.     Defendant Bruce Dart is the Executive Director of the Tulsa Department of Health, and upon information and belief, has an office at the James O. Goodwin Health Center, 5051 S 129th E Avenue, Tulsa, OK 74134.

26.     Defendants Vanessa Hall-Harper, Jeannie Cue, Crista Patrick, Kara Joy McKee, Lori Decter Wright, Phil Lakin Jr., and Ben Kimbro, upon information and belief, have their principle offices at 175 E 2nd St. Fl 4, Tulsa, OK 74103.

27.     The City of Tulsa, upon information and belief, has its principle office at City Hall, 175 E 2nd St. Fl 2, Tulsa, OK 74103.

28.     The Tulsa Department of Health, upon information and belief, has its principle office at the James O. Goodwin Health Center, 5051 S 129th E Avenue, Tulsa, OK 74134.

## JURISDICTION AND VENUE

29.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1343. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## ADDITIONAL BACKGROUND

30.     The Tulsa Mask Mandate was adopted by the Tulsa City Council on July 15, 2020, and approved by the Mayor on July 16, 2020.

31.     The Tulsa Mask Mandate contains the following findings of fact, among others:

WHEREAS, the City of Tulsa is charged with the solemn responsibility of protecting the public peace, health, order, morals, and safety, and promoting the general welfare of the City of Tulsa and its inhabitants;

WHEREAS, on March 15, 2020, the Governor of the State declared an emergency caused by the impending threat of COVID-19 to the people of this State and the public's peace, health and safety, which remains in effect today; and

WHEREAS, on Tuesday, March 17, 2020, the Mayor of the City of Tulsa, issued Executive Order 2020-02 declaring a civil emergency in response to the COVID-19 pandemic, which poses an imminent threat to health, safety and welfare in the City of Tulsa.

32.     The Tulsa Mask Mandate also discusses COVID-19 positive test results and hospitalizations – *but not deaths* – the recommendations of the United States Centers for Disease Control and Prevention, the joint effort between Defendants George Theron Bynum IV and Bruce

Dart, and refers to a finding deeming the Tulsa Mask Mandate "necessary for the protection of the public health and safety of the City of Tulsa and its inhabitants to prevent the introduction and spread of the contagious disease COVID-19 preserve (sic) the peace, and to provide civil defense and emergency functions."

33.     The Tulsa Mask Mandate states that:   "Except as otherwise provided herein, persons located within Public Service Areas of Places of Public Accommodation or an Educational Building are required to wear face coverings at all times when present therein."  It continues: "Except as otherwise provided herein, persons in any Public Setting wherein social or physical distancing cannot be maintained are required to wear face coverings."

34.     The Tulsa Mask Mandate also lists the following exemptions:  persons who the Centers for Disease Control and Prevention say should not wear a face covering; children under 18; restaurant patrons while eating or drinking; people exercising in communal spaces; setting where it is not practical to wear the face covering, like a dentist's office; occupants in a personal vehicle; private homes; and offices where physical distancing cannot be maintained.

35.     Importantly, the Tulsa Mask Mandate does not discuss the scientific facts that COVID-19 transmits largely if not exclusively via person-to-person contact (not in airborne particles), the survival rate for those who contract COVID-19 being nearly 100% for some age groups and 95%-99% for others, or the existence of the unambiguously proven – in actual medical practices, on actual COVID-19 patients – effective treatment of COVID-19 by *FDA approved* budesonide (administered with a nebulizer) or *FDA approved* hydroxychloroquine and zinc treatments.  In other words, the Tulsa Mask Mandate maintains the premise upon which the lockdown was originally based in March 2020, which has since, as the evidence Plaintiffs intend to present, materially changed for the better, rendering any health, safety, or welfare justification

16

or rationale for having the Tulsa Mask Mandate obsolete, irrelevant, and non-existent. Thus the Tulsa Mask Mandate is unconstitutional.

36. Many if not all Tulsa retail businesses have signs that say masks are required for entry. These photos below are an example of Tulsa businesses requiring masks for entry: Jimmy John's at 9168 S. Yale Ave in Tulsa, Staples at 10302 East 71st St in Tulsa, and Whole Foods at 9136 S. Yale Ave in Tulsa. Make no mistake: these signs are the direct result of the Tulsa Mask Mandate by the Defendants, and the Whole Foods sign specifically so states: "*To comply with local executive order*, all customers are required to wear a covering over their nose and mouth at all times while inside our store." (Emphasis added.)

  

37. The Individual Defendants, by passing, or by encouraging the passing of, or by voting in favor of passing, the Tulsa Mask Mandate, conspired to deprive citizens, residents, and guests of Tulsa of their God-given, inalienable rights as Americans as declared and mandated in the Declaration of Independence, as guaranteed by the United States Constitution. They are personally liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for intentionally, recklessly, willfully, and wantonly harming Plaintiffs and others under color of state law, i.e., by mandating the wearing

of masks, which violates the Constitution of the United States as described in more detail below. Make no mistake: in passing – or otherwise being involved in the passing of, or by conspiring to pass – the Tulsa Mask Mandate, the Individual Defendants acted in an arbitrary, unjustified, unreasonable, reckless, and harmful manner, grossly abusing the lawful powers of office. Indeed, the United States Supreme Court has unambiguously stated that: "when a state officer acts under a state law in a manner violative of the Federal Constitution, he comes into conflict with the superior authority of that Constitution, and he is, in that case, stripped of his official or representative character, and is subjected *in his person* to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." Scheuer v. Rhodes, 416 U.S. 232, 237 (1974) (emphasis original; quotations and citations omitted).

38.     The United States Supreme Court has also observed that 42 U.S.C. § 1983 "was meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." Scheuer v. Rhodes, 416 U.S. at 243. "Through the Civil Rights statutes, Congress intended to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." Id. (citations and quotations omitted). "When there is a substantial showing that the exertion of state power has overridden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed against the individuals charged with the transgression." Id. at 249 (citations and quotations omitted).

39.     Supplementing what is previously stated earlier in this First Amended Complaint, it is important to note that wearing a mask can cause the wearer of the mask to experience the

following side effects, illnesses, and complications: "maskne," oral thrush, "mask mouth," facial dermatosis, candida growth, cold sores, hypoxia, blood clots, rebreathing of viral particles, decreased oxygen in the immediate atmosphere and decreased arterial oxygen, cardiac arrest, collapsed lung, carbon dioxide rebreathing and hypercapnia, and increased cellular invasion.  See Jim Meehan MD, *Healthy People Should Not Wear Face Masks:  The Pandemic of Bad Science and   Public   Health   Misinformation   on   Community   Wearing   of   Masks* https://docs.google.com/document/d/1K_ngHBM5Re5e1ynqq16jXcausegFiOFJxmKV9h3ZUaw /edit.

40.    On or about September 9, 2020, the Centers for Disease Control and Prevention found and published on September 9, 2020 that: "*For 6% of the deaths, COVID-19 was the only cause mentioned. For deaths with conditions or causes in addition to COVID-19, on average, there were 2.6 additional conditions or causes per death. The number of deaths with each condition or cause is shown for all deaths and by age groups.*"   https://www.cdc.gov/nchs/nvss /vsrr/covid_ weekly/index.htm (emphasis added) (last viewed September 14, 2020).

41.    What is particularly disturbing is that the Tulsa Mask Mandate remains in full force and effect despite the serious health side effects, illnesses, and complications associated with wearing masks, and despite the fact that that the Centers for Disease Control and Prevention reported on September 9, 2020 that only 6% of all COVID-19 deaths are solely attributable to COVID-19 – this number, at the time of the report, was less than 10,000, and the going death rate of life before COVID-19, according to the Centers for Disease Control and Prevention, is more than 5,000 people *every single day*.   See https://www.cdc.gov/nchs/fastats/leading-causes-of-death.htm (last checked September 14, 2020).   Given all of the overwhelming scientific and medical evidence stated above, the Tulsa Mask Mandate is hopelessly unconstitutional.  The fact

that it has not yet been repealed is an unambiguous impermissible overreach of governmental officials acting under the color of law and harming citizens of the United States and others. Accordingly, the Tulsa Mask Mandate should be immediately repealed, and damages should be awarded to Plaintiffs to the extent Plaintiffs experienced harm; likewise, punitive and exemplary damages should be awarded against the Defendants for their utterly reprehensible and irresponsible behavior.

## COUNT I
### (Tulsa Mask Mandate – Unconstitutional – Violates the Tenth Amendment)

42.     Plaintiffs incorporate each and every allegation set forth above and below as if fully set forth herein.

43.     As previously stated, the Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

44.     The Tulsa Mask Ordinance violates the Tenth Amendment because it seeks to regulate the fundamental right of refusing medical treatment by requiring persons to wear face coverings as set forth above, but it is not narrowly tailored to achieve any compelling government interest.  The Tulsa Mask Ordinance, by requiring people to wear face coverings, *harms* humans. How can harming people by depriving them of oxygen necessary to live and function possibly be a defensible or valid compelling government interest?

45.     The Tulsa Mask Mandate has no real or substantial relation to protecting public health and in fact, harms the public, who is forced to wear face coverings in order to comply with the Tulsa Mask Mandate.

46.     The Tulsa Mask Mandate is beyond all question, a plain, palpable invasion of rights secured by the fundamental law – the Constitution.

20

Case 4:20-cv-00410-TCK-FHM   Document 18 Filed in USDC ND/OK on 09/14/20   Page 21 of 39

## COUNT II
(Tulsa Mask Mandate – Unconstitutional – Violates Equal Protection Clause)

47.     Plaintiffs incorporate each and every allegation set forth above and below as if fully set forth herein.

48.     The Equal Protection clause is found in the Fourteenth Amendment, which provides: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

49.     The Tulsa Mask Mandate applies differently to people who are exempt than it does to people who are not exempt, and therefore does not treat everyone equally, and violates the equal protection clause.

50.     The Tulsa Mask Mandate has no real or substantial relation to protecting public health and in fact, harms the public, who is forced to wear face coverings in order to comply with the Tulsa Mask Mandate.

51.     The Tulsa Mask Mandate is beyond all question, a plain, palpable invasion of rights secured by the fundamental law – the Constitution.

## COUNT III
(Tulsa Mask Mandate – Unconstitutional – Violates Ninth Amendment)

52.     Plaintiffs incorporate each and every allegation set forth above and below as if fully set forth herein.

53.     The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

54.     The Ninth Amendment is oft forgotten and infrequently applied.  The right to wear or not wear face coverings, eye coverings, ear coverings, or hand coverings while in public is a fundamental right, and if it's not, it has to be.  Is a government mandate requiring wearing visors

to protect against skin cancer a proper exercise of police power?  Or gloves when it's cold outside to prevent frost bite?  Or ear coverings at a rock concert playing music loudly enough to damage hearing?

55.     The Tulsa Mask Mandate has no real or substantial relation to protecting public health and in fact, harms the public, who is forced to wear face coverings in order to comply with the Tulsa Mask Mandate.

56.     The Tulsa Mask Mandate is beyond all question, a plain, palpable invasion of rights secured by the fundamental law – the Constitution.

### COUNT IV
(Tulsa Mask Mandate – Unconstitutional – Violates Due Process)

57.     Plaintiffs incorporate each and every allegation set forth above and below as if fully set forth herein.

58.     The Fifth Amendment and the Fourteenth Amendment provide that no person shall be deprived of life without due process of law.

59.     Humans need oxygen to live, masks deprive people of oxygen, and therefore, masks take away life without due process.

60.     The Tulsa Mask Mandate has no real or substantial relation to protecting public health and in fact, harms the public, who is forced to wear face coverings in order to comply with the Tulsa Mask Mandate.

61.     The Tulsa Mask Mandate is beyond all question, a plain, palpable invasion of rights secured by the fundamental law – the Constitution.

**COUNT V**
(Tulsa Mask Mandate – Unconstitutional – Unreasonable Seizure)

62.     Plaintiffs incorporate each and every allegation set forth above and below as if fully set forth herein.

63.     The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

64.     The Tulsa Mask Ordinance, since it requires the wearing of a face covering, is an unreasonable seizure of the person.

65.     The Tulsa Mask Mandate has no real or substantial relation to protecting public health and in fact, harms the public, who is forced to wear face coverings in order to comply with the Tulsa Mask Mandate.

66.     The Tulsa Mask Mandate is beyond all question, a plain, palpable invasion of rights secured by the fundamental law – the Constitution.

**COUNT VI**
(Tulsa Mask Mandate – Unconstitutional – Void for Vagueness)

67.     Plaintiffs incorporate each and every allegation set forth above and below as if fully set forth herein.

68.     The Constitution requires criminal law to state explicitly and definitely what conduct is punishable; a statute is void for vagueness if it fails to do so.

69.     A statute is similarly void for vagueness if a legislature's delegation of authority to judges or administrators is so extensive that it would lead to arbitrary prosecutions.

70.     The Tulsa Mask Mandate, by its terms, is part of the penal code, Title 27, Tulsa revised ordinances, Chapter 4, "Offenses against the Person," and adds Section 409, entitled: "Face Covering and Social Distancing During COVID-19 Pandemic Civil Emergency."

71.     The Tulsa Mask Mandate unambiguously states in paragraph D that there "*is no specific penalty for violation of this ordinance*," yet it contradicts itself and confusingly also states: "*persons refusing to wear a face covering into a Place of Public Accommodation, Educational Institution, or Public Setting as defined herein shall be subject to prosecution under criminal trespass, disturbing the peace, disorderly conduct or similar offenses as circumstances warrant*." (Emphasis added.). Is there a penalty or not?  Are business owners or those in charge of Places of Public Accommodation, Educational Institutions, or Public Settings required to report someone who is not wearing a face covering?  To deny someone entrance and thus refuse revenue if that person is not wearing a face covering?  If business owners or those in charge of Places of Public Accommodation, Educational Institutions, or Public Settings do not report someone who does not wear a face covering in one of those places, are those business owners or those in charge of Places of Public Accommodation, Educational Institutions, or Public Settings aiding and abetting the violation of the ordinance?

72.     The Tulsa Mask Mandate does not appear to contemplate enforcement.  To the extent that it may, however, it appears to delegate enforcement to business owners or those in charge of a Place of Public Accommodation, Educational Institution, or Public Setting.  Without question, if business owners or those in charge of Place of Public Accommodation, Educational Institution, or Public Setting are charged with enforcing the ordinance, it is substantially problematic for at least four reasons.  First, as previously stated, are they aiding or abetting in a crime if they do not report someone who is not wearing a face covering?  Second, are they in

24

charge of determining whether the person not wearing a face covering falls within one of the exemptions?  Third, there is a conflict of interest putting enforcement on business owners who have to enforce the Tulsa Mask Mandate, who at the same time are supposed to be turning away revenue if the potential customer or client refuses to wear a face covering.  Fourth, are business owners or those in charge of Places of Public Accommodation, Educational Institutions, or Public Settings supposed to also determine the sufficiency of the face covering?  Is a paper towel sufficient?  How about lifting your collar to cover your mouth and nose – is that sufficient?  What if a store owner determines that it is. or is not?

73.     The deficiencies with the Tulsa Mask Ordinance and the questions that it raises are endless.

74.     Accordingly, the Tulsa Mask Ordinance is void for vagueness because it fails to state explicitly and definitely what conduct is punishable and what the penalty is, and because it delegates so recklessly and incompetently that it would lead to arbitrary prosecution.

**COUNT VII**
(42 U.S.C. § 1983)

75.     Plaintiffs incorporate each and every allegation set forth above and below as if fully set forth herein.

76.     42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

77.     In enacting the Tulsa Mask Mandate, the Tulsa Mask Mandate itself (p. 2) acknowledges the conspiracy specifically between Bynum & Dart (*and other public health officials*) to deprive Plaintiffs (and others subject to the Tulsa Mask Mandate) of their fundamental, non-negotiable, inalienable rights unambiguously provided by and guaranteed by the Constitution of the United States: "the Mayor of the City of Tulsa joined with the Executive Director of the Tulsa Health Department, *and other public health officials* in consistently encouraging people to use face coverings . . . ." (Emphasis added).  By voting in favor of the Tulsa Mask Mandate, the remaining Individual Defendants (Vanessa Hall-Harper, Jeannie Cue, Crista Patrick, Kara Joy McKee, Lori Decter Wright, Phil Lakin Jr., and Ben Kimbro) were similarly part of that conspiracy, as were the other as yet unnamed "other public health officials."

78.     While there is authority to exclude the individual members of a legislative body such as the Tulsa City Council if those members are acting and voting within their normal and ordinary rule-making functions, there are exceptions, and there is also authority justifying – or at least exploring the possibility of – holding the Individual Defendant members of the Tulsa City Council personally liable, given the fundamental and wholesale stripping of fundamental constitutional rights caused by the enactment of the Tulsa Mask Mandate, because the Individual Defendant Tulsa City Council members committed an act of "an extraordinary character, for which the members who take part in the act may be held legally responsible." Tenney v. Brandhove, 341 U.S. 367, 378 (1951) (citations and quotations omitted).

79.     To be clear:  all Defendants, acting under color of state law (i.e., the Tulsa Mask Mandate), have deprived Plaintiffs and other citizens of the United States of the rights, privileges, and immunities secured by the Constitution, as set forth above.

80.     By the enactment, enforcement, and even the mere existence of the Tulsa Mask Mandate as a result of the reckless, irresponsible, negligent, and outright outlandish conduct of the Defendants, the Plaintiffs have been damaged by the deprivation of their rights, privileges, and immunities secured by the Constitution, including but not limited to the deprivation of oxygen needed to live, and, where applicable, the effects on the health and productivity of their employees, in an amount to be determined at trial.

81.     Defendants – all of them, including the Individual Defendants – are liable to compensate Plaintiffs for those damages, plus other damages, including but not limited to exemplary and punitive damages, interest, and costs, as may be permitted by law.

[REMAINDER OF PAGE INTENTIONALLY BLANK]
[SIGNATURES FOLLOW]

WHEREFORE, Plaintiffs respectfully request that the Court rule in favor of Plaintiffs and find the Tulsa Mask Mandate unconstitutional, and invalidate, strike, and repeal the Tulsa Mask Mandate immediately, and award such monetary damages as may be appropriate, including but not limited to exemplary and punitive damages, interest, and costs, as may be permitted by law.

Dated:       Tulsa, Oklahoma
             September 14, 2020

**DR. ROBERT ZOELLNER,** *PRO SE*

_____

**CLAY CLARK,** *PRO SE*

_____

**JAMES J. DeCRISTOFARO, Esq.,**
*PRO SE*

_____

**AARON A. ANTIS,** *PRO SE*

_____

**DEBBIE L. ANTIS,** *PRO SE*

_____

**STEPHEN N. CURRINGTON,** *PRO SE*

_____

**JASON DANE MALIK BEASLEY,**
*PRO SE*

_____

CONTACT INFORMATION FOR ALL PLAINTIFFS:
THRIVETIME SHOW
1100 RIVERWALK TERRACE
JENKS, OK 74037
Text or call James J. DeCristofaro: (917) 783-3153
**MAKE AMERICA BOOM AGAIN!**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the copy of the foregoing pleading was served on each of the parties hereto by mailing the same to them or to their attorneys of record on the 15th Day of September, 20 20

**Ex. A**

ORDINANCE NO. 24408

Published in the Tulsa World

July ___19___, 2020.

AN ORDINANCE OF THE CITY OF TULSA, OKLAHOMA, AMENDING THE PENAL CODE, TITLE 27,   TULSA REVISED ORDINANCES CHAPTER 4, 'OFFENSES AGAINST THE PERSON' BY ADDING NEW SECTION 409 ENTITLED "FACE COVERING AND SOCIAL DISTANCING DURING COVID-19 PANDEMIC CIVIL EMERGENCY," ADDING DEFINITIONS, MANDATING THE USE OF FACE COVERINGS WITH SOME LISTED EXCEPTIONS, SETTING FORTH A SUNSET EXPIRATION DATE, CREATING PENALTIES FOR NON-COMPLIANCE; DECLARING AN EMERGENCY; REPEALING CONFLICTING ORDINANCES AND PROVIDING FOR THE SEVERABILITY THEREOF.

BE IT ORDAINED AND ENACTED BY THE CITY OF TULSA:

*Section 1. That Title 27, Tulsa Revised Ordinances, "Penal Code" be amended by the addition of new Section 409, to read as follows*:

**Section 409 – Face Covering and Social Distancing During COVID-19 Pandemic Civil Emergency**

A. **Findings of Fact**

WHEREAS, the City of Tulsa is charged with the solemn responsibility of protecting the public peace, health, order, morals, and safety, and promoting the general welfare of the City of Tulsa and its inhabitants;

WHEREAS, on March 15, 2020, the Governor of the State of declared an emergency caused by the impending threat of COVID-19 to the people of this State and the public's peace, health and safety which remains in effect today; and

WHEREAS, on Tuesday, March 17, 2020, the Mayor of the City of Tulsa, issued Executive Order 2020-02 declaring a civil emergency in response to the COVID-19 pandemic, which poses an imminent threat to health, safety and welfare in the City of Tulsa; and

WHEREAS, on Thursday, July 2, 2020, the Mayor of the City of Tulsa, issued Executive Order 2020-13 extending the civil emergency, requiring a safety plan for all events and gatherings with 500 or more attendees, and requiring bar and restaurant employees to wear face coverings while working; and

WHEREAS, as of the 14th day of July, 2020, there were 1,099 active cases (5,448 total cases diagnosed) of COVID-19 in Tulsa County; and

WHEREAS, as of the 14th day of July, 2020, there were 117 COVID-19 positive patients in the hospital, 81 of those persons in the Intensive Care Unit (ICU), with an additional 11 cases in the ICU still under investigation for suspected COVID-19, and only 45 adult ICU beds still available in Tulsa County. 135 patients were treated the same day in acute care clinical settings; and

WHEREAS, as of the 14th day of July, 2020, the State of Oklahoma is not meeting the White House Opening Up America Again gating criteria for downward trajectory of cases or the downward trajectory of positive tests as a percentage of total tests, nor is Tulsa County meeting the 14 day trend of such downward trajectory.

WHEREAS, the Mayor of the City of Tulsa, issued multiple executive orders in response to COVID-19 using the least restrictive means available to protect public health, safety and welfare in the City of Tulsa and ensure an effective response to this disaster; and

WHEREAS, as the City of Tulsa reopened in the midst of COVID-19, increased spread is to be expected, and the key to controlling the spread and keeping the City of Tulsa safe is for all people to consistently follow good hygiene and social-distancing practices; and

WHEREAS, the United States Centers for Disease Control and Prevention (CDC) recommends that people wear cloth face coverings in public settings, particularly when other social distancing measures are difficult to maintain, and when around people who do not live in the same household and;

WHEREAS, the Mayor of the City of Tulsa, joined with the Executive Director of the Tulsa Health Department, and other public health officials in consistently encouraging people to use face coverings, and health authorities have repeatedly emphasized that wearing face coverings is one of the most important and effective tools for reducing the spread of COVID-19; and

WHEREAS, given the current status of COVD-19 in the City of Tulsa, requiring the use of face coverings is a targeted response that can combat the threat to public health using the least restrictive means, and if people follow this requirement, more extreme measures may be avoided; and

WHEREAS, wearing a face covering is important not only to protect oneself, but also to avoid unknowingly harming fellow Tulsans and others with whom they may come into contact, especially given that many people who go into public may have COVID-19 without knowing it because they have no symptoms; and

WHEREAS, due to recent substantial increases in COVID-19 positive cases, and increases in the COVID-19 positivity rate and hospitalizations resulting from COVID-19, further measures are needed to achieve the least restrictive means for reducing the growing spread of COVID-19, and to avoid a need for more extreme measures; and

WHEREAS, it is deemed necessary for the protection of the public health and safety of the City of Tulsa and its inhabitants to prevent the introduction and spread of the contagious disease COVID-19 preserve the peace, and to provide civil defense and emergency functions; and

Therefore, pursuant to Title 11, Oklahoma Statutes, Section 22-120 (A), the City enacts this ordinance mandating that:

## B. Definitions.

"Face Covering" means a covering that fully covers a person's nose and mouth. The term "Face Covering" includes, but is not limited to, cloth face masks, towels, scarves, and bandanas as recommended by the CDC or OSDH, an N95, KN95, or other mask that would be appropriate for a health care setting, or a surgical mask. The Face Covering should fit snuggly on a person's face but allow the person to breathe easily and worn consistent with the guidance provided by the CDC or OSDH.

"Social" or "Physical Distancing" means maintaining six (6) feet of distance between persons who are not part of the same household while in a public accommodation, educational building, or public setting.

"Place of Public Accommodation" means all places offering items, goods or services for purchase or rent, including without limitation retail businesses, personal services and spas, entertainment venues, food service facilities, restaurants and bars, hotels, motels and travel related services, professional offices and services, banks and financial services, repair facilities, motor vehicle dealerships.

"Public Service Area" means areas of a Place of Public Accommodation or an Educational Institution wherein employees interact with the public in the normal course of business.

"Public Setting" means any public place where persons congregate which is not a place of public accommodation including without limitation offices, workplaces, houses of worship and ancillary facilities, child care facilities, hospitals and health facilities, gymnasiums and physical fitness facilities, adult and youth sports facilities, communal outdoor spaces such as sidewalks, trails, and parks, and food trucks and other outdoor retail entities.

"Educational Institution" means any building or facility used for academic or athletic purposes on public school campuses, and any private school or preschool. This term excludes the playing surface of any athletic facility during organized activities and practices.

**C. Face Coverings Mandate Under Certain Circumstances**

Except as otherwise provided herein, persons located within Public Service Areas of Places of Public Accommodation or an Educational Building are required to wear face coverings at all times when present therein. Except as otherwise provided herein, persons in any Public Setting wherein social or physical distancing cannot be maintained are required to wear face coverings.

The following persons, locations and activities are exempt from this requirement:

1. Persons who fall into the U.S. Centers for Disease Control and Prevention's guidance for those who should not wear Face Coverings due to a medical or mental health condition or developmental disability;

2. Children under 18 years of age;

3. Restaurant patrons while they are eating or drinking;

4. Persons exercising in communal outdoor spaces, or persons walking or exercising with other persons from the same household in communal outdoor spaces, as long as Physical Distancing is maintained. Persons congregating in communal outdoor spaces with other persons not in their same household are required to wear Face Coverings when Physical Distancing is not maintained;

5. Settings where it is not practical or feasible to wear a Face Covering, such as dental services, medical treatments or while swimming;

6. Occupants in a personal vehicle, personal office, or similarly private space while other persons outside of the person's household are not present;

7. Private homes; and

8. Offices and workplaces that are not Public Service Areas where Physical Distancing between employees and other occupants can be consistently maintained during hours of operation.

**D. Penalty for Violation of Subsection C.**

There is no specific penalty for violation of this ordinance. However, persons refusing to wear a face covering into a Place of Public Accommodation, Educational Institution, or Public Setting as defined herein shall be subject to prosecution under criminal trespass, disturbing the peace, disorderly conduct or similar offenses as circumstances warrant.

**E. Expiration of Ordinance**

This ordinance shall expire the earlier of: November 30, 2020; the expiration of all Civil Emergency Orders related to COVID-19 issued by the Mayor; or repeal, modification or extension by the City Council through a subsequent ordinance.

*Section 2.      Severability Clause*
If any section, sentence, clause, or phrase of this ordinance or any part thereof is for any reason
found to be invalid by a court of competent jurisdiction, such decision shall not affect the validity
of the remainder of this ordinance or any part thereof.

*Section 3. Repeal of Conflicting Ordinance*
That all ordinances or parts of ordinances in conflict herewith be and the same are now expressly
repealed.

*Section 4. Emergency Clause*
That an emergency is now declared to exist for the preservation of the public peace, health and
safety, by reason whereof this Ordinance shall take effect immediately from and after its adoption
and required approvals.

ADOPTED by the Council: _____**JUL 1 5 2020**_____.
                                                      Date

_____
Chair of the Council

ADOPTED as an emergency measure: _____**JUL 1 5 2020**_____.
                                                                          Date

_____
Chair of the Council

OFFICE OF THE MAYOR

Received by the Mayor: _____, at _____

G.T. Bynum, Mayor

By _____
      Secretary

APPROVED by the Mayor of the City of Tulsa, Oklahoma: _**JUL 1 6 2020**_,
                                                                                            Date
at _____.
      Time

DocuSign Envelope ID: 0D49985E-84E7-4B49-A836-22BBECF093BA

_____
Mayor

(Seal)
ATTEST:

_____
City Clerk

APPROVED AS TO FORM AND
LEGALITY:

_____
City Attorney

**Ex. B**

Sherry G. Lewelling
Executive Director

J. Kevin Stitt
Governor



Oklahoma State Board of Cosmetology and Barbering
Advisory Board on Massage Therapy

**Safety Guidelines for reopening Barber and Cosmetology Salons**

**REVISED FOR PHASE 3**

It is acknowledged that all services within the Professional Beauty Industry (Cosmetology, Barbering, Nails and Esthetics) carry some risk in this viral environment due to the nature of the services provided and the inability to maintain social distancing. With that said, all licensed professionals in the Cosmetology and Barber industry have been trained to a national standard to mitigate these risks significantly through the use of proper infection control standards required by the Oklahoma State Board of Cosmetology and Barbering regulatory licensing rules and regulations.

The following recommendations, therefore, are enhancements to those existing rules and they address the unique scenario presented by the COVID-19 pandemic. Therefore, in this environment we are going to follow all Universal Precautions and assume that everyone is COVID-19 positive and take all the precautions necessary to mitigate the risk of the spread while still performing services. **(175:10-7-20)**

In light of the COVID-19 pandemic, the Oklahoma State Board of Cosmetology and Barbering recommends moving into **PHASE 3.** Cosmetology and barbering related establishments and schools, shall follow these guidelines in order to protect the safety of clients and employees.  The recommendations should be used in conjunction with the Boards established rules and regulations that are currently in place.

- **Appointments-** Establishments can operate at full staff and accommodate more appointment clients as well as walk in traffic, as long as they maintain social distancing guidelines. Advise clients that the salon/shop is limiting guest inside the establishment to only those individuals that are receiving services, all other individuals should wait outside the establishment.
- **Distancing – CDC and the Oklahoma Department of Commerce guidelines require following the social distancing.**  It is acknowledged that social distancing recommendations of 6 feet cannot be met in the actual service itself, however; the following distancing measures can be instituted to reduce risk:
  - ➢ Spacing between persons in the salon should be at least six feet at all times.
  - ➢ Maintain social distancing guidelines within the establishment including the break room, waiting area, classroom, or clinic/salon/shop area.
- **Personal Protective Equipment-**
  - ➢ **Masks** – Establishment employees/workers/booth renters etc.: In the Governor's **PHASE 3** plan, Mask are not required, however; protecting your health and safety as well as the clients, should be priority.
  - ➢ **Capes – (175:10-7-5)** Each client should be draped with a clean cape.  Capes should be disinfected between every use, using a disinfectant spray or disinfectant wipe or a clean disinfectant saturated towel and allow to set according to recommended contact time of the product used. Disinfectants can be mixed according to directions and put in a spray bottle for use. Technicians should have several clean/disinfected capes available at all times.
    Capes should be laundered at the end of the day following the fabric recommendations.
    **Neck strips/towel– (175:10-7-12)** Employees should use protective neck strips/towels around the neck and under the cape of each client.

1

Sherry G. Lewelling
Executive Director

J. Kevin Stitt
Governor



Oklahoma State Board of Cosmetology and Barbering
Advisory Board on Massage Therapy

- ➤ **Hand Hygiene- (175:10-7-8)** Proper hand hygiene is documented to be an essential action to reduce the spread of viral illness. Washing hands with soapy, warm water, for a minimum of 20 seconds will be required by employees between every client service and as frequently as possible, but always after eating, smoking and using the restroom.
- • Disinfection – (175:10-7-6)
  - ➤ All salons/shops should be thoroughly cleaned and disinfected.
  - ➤ Use disinfectants that are EPA –registered and labeled as bactericidal, virucidal and fungicidal. No product will be labeled for COVID-19 yet, but many will have human coronavirus efficacy either on the label or available on their website. The EPA has approved any product that has tested as effective against human coronavirus. If in doubt of the effectiveness, check the EPA website.
  - ➤ Disinfectant for immersion of tools, must be mixed daily and replaced sooner if it becomes contaminated throughout the workday. Disinfectant only works on a clean surface so clean all surfaces and tools with hot soapy water, or cleaning wipes (if using wipes, be sure to cover surface thoroughly) before disinfecting.
  - ➤ Contact time on label must be observed for disinfectant to work. Contact time refers to how long the disinfectant is visibly wet on the surface allowing it to thoroughly destroy all the pathogens.
  - ➤ Disinfectants used for immersion must be changed daily or sooner if it becomes contaminated (ex: hair/debris floating in solution or cloudy solution.)
  - ➤ Disinfection is for hard non-porous surfaces, glass metal and plastic.
  - ➤ Porous/soft surfaces cannot be disinfected and must be used only one time and then discarded (tools such as cardboard files, buffers, drill bits etc.)
  - ➤ Launder all linens, towels drapes, capes and smocks in hot soapy water and dry completely at the warmest temperature allowed. (till they are hot to the touch). Store clean linens in an enclosed cabinet or closed container. Store all used/dirty linens in an enclosed container.
- • **Reception area – (175:10-7-4)**
  - ➤ Wipe down all seats and tables. Cloth chairs cannot be properly cleaned and disinfected, using a plastic cover should be considered.
  - ➤ Disinfection of high touch areas including, but not limited to:
    Door handles on main entrance and restrooms
    Restrooms
    Reception desk
    Point of sale equipment
    Stations (including foot/nail drying stations)
    Displays and display products
  - ➤ Employees should frequently wash their hands after the using the phones, computer, cash register and/or credit card machine. Wipe these surfaces between each use.
  - ➤ Clean and wipe all door handles and other surfaces that are regularly touched by clients and staff with disinfectant wipes.
  - ➤ **Restrooms – (175:10-7-19)**

2

Sherry G. Lewelling
Executive Director

J. Kevin Stitt
Governor



**OSBCB ABMT**
OKL^HOMA STATE BOARD OF
COSMETOLOGY AND BARBERING
ADVISORY BOARD ON MASSAGE THERAPY

Oklahoma State Board of Cosmetology and Barbering
Advisory Board on Massage Therapy

- ➢ Clean and disinfect ALL restroom surfaces including floors, sinks and toilet bowls. Store paper products in a closed cabinet. Place trash can near the door or within reach of the door. Remove anything that does not have to be in the restrooms. Restroom are required to be supplied with liquid soap and paper towels. No cloth towels.
- **Shampoo Bowls- (175:10-7-4)**
  - ➢ Clean and disinfect all bowls, hoses, spray nozzles, faucet handles, shampoo chairs and arm rests. Wipe down all back-bar products and shelves. Discard and replace any products that have not been stored in a closed container.
- **Salon/Shop/Clinic Areas – (175:10-7-4)**
  - ➢ Clean and disinfect all work area surfaces. Clean and disinfect chairs, head rest, and arm rests. Clean and disinfect all reusable tools and store in an airtight closed container. Clean and disinfect all appliances, sheers, clippers, clipper guards, clippies, rollers, combs, brushes, rolling carts and any other items used in connection with servicing clients.
  - ➢ Check to make sure all products such as lotions, creams, waxes and scrubs have always been in a closed container, if not you must discard and replace.
  - ➢ Remove and discard all single use tools such as paper files, drill bits and buffers, that have already been used.
  - ➢ Clean and disinfect all linen hampers. Clean and disinfect trash containers and replace trash liners daily or more often as needed. Trash Containers should have a lid that can be closed.
- **Pedicure Bowls- (175:10-7-30)**
  - ➢ Remove all parts that can be removed.
  - ➢ Clean all removed parts with soap and water, rinse in clear water and then immerse into properly diluted disinfectant for full recommended contact time.
  - ➢ Scrub bowl with soap and water and replace removed parts to bowl.
  - ➢ Rinse in bowl with clean water.
  - ➢ Fill bowl again with clean water and proper amount of disinfectant and let stand for proper contact time requirements.
  - ➢ If your bowl has jets, allow the jets to run for a full 10 minutes with disinfectant solution.
- **Treatment rooms- (175:10-7-5)**
  - ➢ Clean and disinfect all surfaces such as, chairs, tables, electrical appliances (don't forget the cords).
  - ➢ Clean and disinfect all linens and store in a closed container/cabinet.
  - ➢ Clean and disinfect all linen hampers. Clean and disinfect trash containers and replace trash liners daily or more often as needed. Trash Containers should have a lid that can be closed.
  - ➢ Empty all wax pots and disinfect before refilling them with new wax. Single use applicators must be used only one time and then discarded after each use. (do not double dip).
  - ➢ **The above guidelines are the minimum requirements at this time.**
    Establishment owners/managers may implement other safety protocol procedures to support these guidelines.

3